**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA**

| | |
|---|---|
| JOSEPH FERGUSON, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>   *v.*<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>*Defendant.* | Case No. 1:21-cv-2110<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Joseph Ferguson, individually and on behalf of all others similarly situated, brings this Class Action Complaint and Demand for Jury Trial against Defendant National Collegiate Athletic Association ("NCAA") to obtain redress for injuries sustained a result of Defendant's reckless disregard for the health and safety of generations of Truman State University ("TSU") student-athletes. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

**INTRODUCTION**

1.      Nearly one hundred thousand student-athletes sign up to compete in college football each year, and it's no surprise why. Football is America's sport and Plaintiff and a Class of football players (defined below) were raised to live and breathe the game. During football season, there are entire days of the week that millions of Americans dedicate to watching the game. On game days, hundreds of thousands of fans fill stadium seats and even more watch around the world. Before each game, these players—often mere teenagers—are riled up and told

to do whatever it takes to win and, when playing, are motivated to do whatever it takes to keep going.

2.      But up until 2010, Defendant NCAA kept players and the public in the dark about an epidemic that was slowly killing college athletes.

3.      During the course of a college football season, athletes absorb more than 1,000 impacts greater than 10 Gs (gravitational force) and, worse yet, the majority of football-related hits to the head exceed 20 Gs, with some approaching 100 Gs. To put this in perspective, if you drove your car into a wall at twenty-five miles per hour and weren't wearing a seatbelt, the force of you hitting the windshield would be around 100 Gs. Thus, each season these 18, 19, 20, and 21-year-old student-athletes are subjected to repeated car accidents.

4.      Over time, the repetitive and violent impacts to players' heads led to repeated concussions that severely increased their risks of long-term brain injuries, including memory loss, dementia, depression, Chronic Traumatic Encephalopathy ("CTE"), Parkinson's disease, and other related symptoms. Meaning, long after they played their last game, they are left with a series of neurological events that could slowly strangle their brains.

5.      For decades, Defendant NCAA knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries (referred to as "traumatic brain injuries" or "TBIs") that resulted from playing college football, but recklessly disregarded this information to protect the very profitable business of "amateur" college football.

6.      While in school, TSU football players were under Defendant's care. Unfortunately, Defendant did not care about the off-field consequences that would haunt students, like Plaintiff Ferguson, for the rest of their lives.

7.      Despite knowing for decades of a vast body of scientific research describing the danger of traumatic brain injuries ("TBIs") like those Plaintiff experienced, Defendant failed to implement adequate procedures to protect Plaintiff and other TSU football players from the long-term dangers associated with them. They did so knowingly and for profit.

8.      As a direct result of Defendant's acts and omissions, Plaintiff and countless former TSU football players suffered brain and other neurocognitive injuries from playing NCAA football. As such, Plaintiff brings this Class Action Complaint and Demand for Jury Trial in order to vindicate those players' rights and hold the NCAA accountable.

## PARTIES

9.      Plaintiff Joseph Ferguson is a natural person and citizen of the State of California.

10.     Defendant NCAA is an unincorporated association with its principal place of business located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA is not organized under the laws of any State, but is registered as a tax-exempt organization with the Internal Revenue Service. As such, Defendant NCAA is a citizen of the State of Indiana pursuant to 28 U.S.C. § 1332(d)(10).

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the Class, which consists of at least 100 members, is a citizen of a different state than Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply to this action.

12. This Court has personal jurisdiction over Defendant NCAA because it conducts significant business in this District, including establishing consumer and business contracts here, and because it maintains its principal place of business in this District.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in and/or emanated from this District, and because Defendant NCAA resides here.

## FACTUAL BACKGROUND

### I. Defendant Had A Duty To Protect TSU Student-Athletes, Including Plaintiff.

14. The NCAA is the governing body of collegiate athletics that oversees twenty-three college sports and over 400,000 students who participate in intercollegiate athletics, including the football program at TSU. According to the NCAA, more than 1,200 schools, conferences and affiliate organizations collectively invest in improving the experiences of athletes—on the field, in the classroom, and in life.

15. The NCAA brings in more than $750 million in revenue each year and is the most significant college sports-governing body in the United States.

16. The NCAA plays a significant role in governing and regulating the TSU football program and owes a duty to safeguard the well-being of its student-athletes.

17. In fact, since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[1] The IAAUS was specifically formed for this purpose

---

[1] *Who We Are*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/about/who-we-are (last visited July 26, 2021).

because, at the turn of the twentieth century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. After several subsequent meetings of colleges, the NCAA was established.[2]

18.    As such, the genesis of the NCAA was for a singular goal: "to keep college athletes safe."[3]

19.    The overarching principles of the NCAA, including its purported commitment to safeguarding its athletes, are contained in the NCAA Constitution. The NCAA Constitution clearly defines the NCAA's purpose and fundamental policies to include maintaining control over and responsibility for intercollegiate sports and athletes. The NCAA Constitution states:

> The purposes of this Association are:
>
> (a)    To initiate, stimulate and improve intercollegiate athletics programs for student-athletes ...;
>
> (b)    To uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;

NCAA Const., Art. 1, § 1.2(a)(b).

20.    The NCAA Constitution also defines one of its "Fundamental Polic[ies]" as the requirement that "[m]ember institutions shall be obligated to apply and enforce this legislation, and the infractions process of the Association shall be applied to an institution when it fails to fulfill this obligation." NCAA Const., Art. 1 § 1.3.2.

---

[2]    In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

[3]    *Well-Being*, Nat'l Collegiate Athletic Ass'n, http://www.ncaa.org/health-and-safety (last visited July 26, 2021).

21. Article 2.2 of the NCAA Constitution specifically governs the "Principle of Student-Athlete Well-Being," and provides:

> **2.2 The Principle of Student-Athlete Well-Being.**
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes. (Revised: 11/21/05[.])
>
> **2.2.3 Health and Safety.**
> It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. (Adopted: 1/10/95[.])

22. To accomplish this purpose, the NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. Both NCAA member institutions, including schools like TSU, and NCAA conferences are obligated to abide by the NCAA's rules and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs . . . Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2 § 2.8.1.

23. The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risks of

injury from athletics participation."

24.    The NCAA, therefore, holds itself out as both a proponent of and authority on the treatment and prevention of sports-related injuries upon which NCAA athletes (including Plaintiff Ferguson), TSU, and all other member institutions can rely for guidance on player-safety issues.

25.    Plaintiff Ferguson—and football players at TSU—relied upon the NCAA's authority and guidance to protect his health and safety by treating and preventing head-related injuries, including the effects of those head injuries later on in his life.

26.    As compared to Plaintiff and other TSU football players, the NCAA was in a superior position to know of and mitigate the risks of sustaining concussions and other TBIs while playing football at TSU. It failed to do so.

## II.    Decades of Studies Firmly Establish the Dangers of Football-Related Concussions.

27.    Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions and TBIs, with a heightened risk of long-term injuries and impacts, including—but not limited to—memory loss, dementia, depression, Alzheimer's disease, Parkinson's disease, and CTE.

28.    Such violent impacts to the head are a one-way street for those who experience them. As Jonathan J. Russin—Assistant Surgical Director at the USC Neurorestoration Center at the Keck School of Medicine—has stated, "there's no way to undo a traumatic brain injury," and one's "best bet is to avoid concussions altogether."[4]

---

[4]    Deanna Pai, *Do Concussions Increase the Risk of Stroke or Brain Cancer?*, Keck Med. of USC, https://bit.ly/2MzSkkC (last visited July 26, 2021).

29.     To better understand the results of these studies, a brief introduction to concussions in football follows.

A.     An Overview of Concussions in Football.

30.     A TBI is an injury to the brain that comes as the result of the application of either external physical force or rapid acceleration and deceleration forces, which disrupts brain function in a manner that causes impairments in cognitive and/or physical function.

31.     A concussion is a TBI initiated by an impact to the head, which causes the head and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist within the skull, damaging brain cells and leading to harmful chemical changes in the brain.

32.     The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against the skull. But relatively minor impacts—including not only direct blows to the head, but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

33.     Concussions typically occur when linear and rotational accelerations impact the brain through either direct impact to the head or indirect impacts that whiplash the head. During the course of a college football season, studies have shown that athletes can receive more than 1,000 impacts greater than 10 Gs. This is slightly more force than a fighter pilot receives from performing maximal maneuvers. The majority of football-related hits to the head exceed 20 Gs, with some going well over 100 Gs.

i.     *Concussion Symptoms.*

34.     When a collegiate athlete suffers a severe impact to the head, he may experience concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

- memory loss;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred speech or saying things that do not make sense;

- difficulty concentrating, thinking, or making decisions;

- difficulty with coordination or balance;

- feeling anxious or irritable for no apparent reason; and

- feeling overly tired.

35.     A collegiate athlete may not recognize the signs and/or symptoms of a concussion, and, more often, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

ii.     *Post-Concussion Treatment.*

36.     After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because, immediately after a concussion, the brain is particularly vulnerable to further injury. Even after the immediate effects have worn off, a person who has suffered a concussion is four to six times more likely to receive another concussion than a person who has been concussion-free.

37.     The length of the healing process varies from person to person and from

concussion to concussion. Symptoms may even last for one or two weeks.

38.     Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months, and sometimes can even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

39.     Still, many people think of concussions as short-term, temporary injuries. However, decades of scientific research demonstrate the effects of concussions are anything but temporary.

B.     Studies Confirm the Dangers and Long-Term Effects of Concussions.

40.     Two of the leading studies of the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called the tau protein.

41.     In his early studies, Dr. Robert Cantu of the Boston University Center for the Study of Traumatic Encephalopathy found evidence of CTE in 90 of 94 (96%) autopsied brains of former NFL players. A recent update to these studies found CTE in a staggering 110 of 111 (99%) former NFL players and 48 of 53 former college players (91%).[5]

42.     These more recent studies were neither aberrations nor surprises but confirmations of what was already known or readily apparent from the existing medical

---

[5]     Jesse Mez, MD, MS, *et al*., *Clinicopathological Evaluation of Chronic Traumatic Encephalopathy in Players of American Football*, 318 JAMA 4, 360–370 (2017).

literature.

43.    Studies like these, which establish the devastating dangers related to TBIs, date back to the early twentieth century. For example, in an article in the 1905 multi-volume medical text *A System of Medicine*, surgeon Sir William Bennett noted that the dangers from TBIs can arise just as easily when "no loss of consciousness occurs at all[,]" and that such injuries "may in the end have far graver results" due to their "escap[ing] treatment altogether in the first instance" given their less severe appearance.[6] Bennett noted that the imposition of a strict treatment regimen immediately after an injury, during initial recovery, and following the initial recovery period, was essential to the "treatment of all cases of concussion of the brain, whether they be severe or slight."

44.    Some early articles from this period began to recognize the unique dangers presented by football, specifically. The editors of the *Journal of the American Medical Association* recognized the long-term risks of such head injuries very early on, writing in 1905 that "[t]o be a cripple or lunatic for life is paying high for athletic emulation" via football.[7] Similarly, the risks of concussion in football were discussed in a 1906 article by Dr. Edward Nichols, who observed that a concussed player might go through multiple plays before his teammates noticed his altered mental state.[8]

45.    Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science began to clearly recognize the debilitating effects of concussions and other TBIs, connect it to contact sports (including football), and find that repetitive head impacts can cause

---

[6]    Sir William Bennett, *Some Milder Forms of Concussion of the Brain*, A Sys. of Med. Vol. 8 231-32 (2d ed. 1910).

[7]    Editors, *The Football Mortality*, 39 JAMA 1464 (1905).

[8]    Edward Nichols, *The Physical Aspect of American Football*, 154 Boston Med. & Surgical J.1 (1906).

permanent brain damage and increased risk of long-term cognitive decline and disability.

46.    For instance, in 1927, Drs. Michael Osnato and Vincent Giliberti discussed a disease they called traumatic encephalitis in an article on post-concussion damage in *Archives of Neurology & Psychiatry*, concluding that brain disease could manifest in "young men knocked out in football and other games," but noting that the issue had "not received adequate attention."[9] Then, in 1928, Pathologist Dr. Harrison Martland published a study called "Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head.[10]

47.    Countless studies were later conducted on boxers suffering chronic neurological symptoms as a result of repeated head injuries, and who displayed signs of dementia and impairment of motor functions.[11] As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline. However, in a chapter of a mid-twentieth century book on brain injuries, psychiatrists Karl M. Bowman and Abram Blau coined the term "chronic traumatic encephalopathy" to explain the deterioration of a boxer's mental state over time.[12]

---

[9]    Michael Osnato & Vincent Giliberti, *Postconcussion Neurosis-Traumatic Encephalitis*, 18 Archives of Neurology & Psychiatry 181 (1927).

[10]    Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

[11]    *See*, *e.g.*, E. Guttmann & C.E. Winterstein, *Disturbances of Consciousness After Head Injuries: Observations on Boxers*, 84 J. of Mental Sci. 347 (Mar. 1938); Harry L. Parker, *Traumatic Encephalopathy ('Punch Drunk') of Professional Pugilists*, 15 J. of Neurology & Psychopathology 20 (July 1934); C.E. Winterstein, *Head Injuries Attributable to Boxing*, 2 Lancet 719 (Sept. 1937).

[12]    K.M. Bowman & A. Blau, *Psychotic States Following Head and Brain Injury in Adults and Children*, Injuries of the Skull, Brain and Spinal Cord: Neuropsychiatric, Surgical, and Medico-Legal Aspects 309 (S. Brock, ed. 1940).

48.    In 1936, Dr. Edward J. Carroll, Jr. wrote an article further recognizing "punch-drunk syndrome's" seriousness, stating that "no head blow is taken with impunity, and [] each knock-out causes definite and irreparable damage. If such trauma is repeated for a long enough period, it is inevitable that nerve cell insufficiency will develop ultimately, and the individual will become punch-drunk." He also noted that in addition to boxers, punch drunk had been recognized among football players.[13]

49.    The next year, the American Football Coaches Association published a report warning that players who suffer even "one concussion" should be removed from play.[14]

50.    In 1952, an article published in *The New England Journal of Medicine* first recommended a "three-strike rule" for concussions in football, demanding that players cease to play football permanently after receiving their third concussion.[15]

51.    Starting in the late 1960s, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. John R. Hughes and D. Eugene Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms ("EEGs").[16] Several years after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling the skull cannot accommodate.

52.    In 1975, the Chief Medical Officer of the British Boxing Board of Control

---

[13]    Edward J. Carroll, Jr., *Punch-Drunk*, 191 Am. J. Med. Sci. 706 (1936).

[14]    Proceedings of the Seventeenth Annual Meeting of the American Football Coaches Association (Dec. 29, 1937) ("Sports demanding personal contact should be eliminated after an individual has suffered a concussion").

[15]    Augustus Thorndike, *Serious Recurrent Injuries of Athletes—Contraindications to Further Competitive Participation*, 247 New Eng. J. Med. 554, 555-56 (1952).

[16]    John R. Hughes & D. Eugene Hendrix, *Telemetered EEG From A Football Player In Action*, 24 Electroencephalography & Clin. Neurophysiology 183 (1968).

suggested boxers were not the only persons or athletes vulnerable to the risk of long-term brain injuries, stating:

> Irreversible brain damage caused by regular excessive punching can cause a boxer to become punch drunk, a condition known euphemistically in medical terms as [Chronic] Traumatic Encephalopathy. The condition can be caused by other hazards of contact sports—taking too many falls whilst hunting or steeple chasing or the continual use of brute force rather than skill in the rugby field or heading a football incessantly over many years. **Anything which entails intermittent trauma to the head can cause it.**[17]

53.    Overall, countless studies—published in prominent medical journals such as the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet*—warned of the dangers of single concussions, multiple concussions, and/or football-related head trauma from multiple concussions and head injuries. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potential dangerous long-term effects on brain function;
- traumatic encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;
- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) in the brainstem;
- with respect to head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;
- immediate retrograde memory issues occur following concussions;
- head injuries require recovery time without risk of subjection to further injury;
- a football player who suffers a concussion requires significant rest before being subjected to further contact; and
- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage,

---

[17]    J.W. Graham, *Eight, Nine, Out! Fifty Years as Boxer's Doctor*, 56 (1975).

> reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

54.     As a result of these studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

55.     By 1991, Dr. Robert Cantu, the American Academy of Neurology, and the Colorado Medical Society had developed return-to-play criteria for football players suspected of sustained head injuries.

56.     In 2003, an NCAA concussion study concluded that football players who had previously sustained a concussion were more likely to have future concussion injuries. Another 2003 NCAA concussion study concluded that collegiate football players "may require several days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks."[18]

57.     Following these studies, in 2004, the National Athletic Trainers' Association published a position statement, recommending baseline cognitive and postural-stability testing, as well as return-to-play recommendations, including holding out athletes who exhibit symptoms of a suspected head injury.

58.     Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of the safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports, based on the most up-to-date research. These experts recommended that a player never be returned to play

---

[18]     Michael McCrea, *et al.*, *Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, The NCAA Concussion Study*, *The Journal of the Am. Med. Ass'n* (November 19, 2003), *available at* http://jama.jamanetwork.com/article.aspx?articleid=197668.

while symptomatic, and coined the phrase, "when in doubt, sit them out."

59.    Ultimately, while the NCAA knew of the harmful effects of TBIs (and other head injuries) on athletes for decades, they ignored these facts and failed to institute any meaningful methods of warning and/or protecting the athletes, including football players like Plaintiff Ferguson and other TSU student-athletes. For the NCAA, the continued expansion and operation of college football was simply too profitable to put at risk.

## III.    The NCAA Breached Its Duties to Its Student-Athletes, Including Plaintiff Ferguson, by Ignoring the Dangers of Concussions and Failing to Implement Adequate Concussion Management Protocols.

60.    For decades, the NCAA has been aware—through its own institutional knowledge, internal research, and current medical science, among other sources of information— that severe and/or repeated head impacts can lead to long-term brain injuries, including memory loss, dementia, depression, and CTE. Unfortunately, while the NCAA knew about the harmful and devastating effects of these sub-concussive and concussive injuries, it recklessly ignored these facts and failed to implement reasonable concussion management protocols to protect its athletes, including Plaintiff.

61.    Such conduct stands in stark contrast to the NCAA's approach in comparable contexts. For instance, in 1960, the NCAA wholly discontinued its relationship with collegiate boxing following widespread criticism of the sport's dangers and a heightened organizational awareness of the long-term risks student boxers faced—including, but not limited to, developing "punch drunk syndrome." But as to college football, including TSU's football program, the NCAA continued to govern, support, and profit from the sport without disclosing what it knew to student-athletes, including Plaintiff Ferguson.

62.    Since at least 1933, the NCAA has known of the serious nature of concussions

and other head injuries in college football, and even recognized the need for appropriate concussion management protocols. In its 1933 Sports Medicine Handbook—which it distributed to all member institutions—the NCAA specifically recognized that head injuries warrant special attention and should not be regarded lightly.

63.     The 1933 Sports Medicine Handbook then provided information for school and college doctors, coaches, and trainers to identify the signs and symptoms of concussions, as well as methods to be used on the sidelines for treating them. It discussed head injuries, stating that they "are in a category by themselves and warrant special attention[,]" as they "may be, and often are more severe in their immediate and remote consequences" than other injuries. Notably, the 1933 Sports Medicine Handbook recommended that, when concussion-related symptoms lasted longer than two days, players "should not be permitted to compete for 21 days or longer, if at all." It also stated, "[t]here is definitely a condition described as 'punch drunk' and often recurrent concussion cases in football and boxing demonstrate this[,]" and that "[a]ny individual who is knocked unconscious repeatedly on slight provocation should be forbidden to play body-contact sport."

64.     The NCAA recognizes that its Sports Medicine Handbook "may constitute some evidence of the legal standard of care," and has publicly recognized its duty and moral obligation to protect collegiate athletes. As NCAA President Mark Emmert testified to the Senate Commerce Committee in January 2014, "I will unequivocally state we have a clear moral obligation to make sure we do everything we can to protect and support student-athletes."

65.     Indeed, in the September 1968 issue of NCAA News, the NCAA published an article entitled *Dangers of Grid Head Injuries Cited by Safeguards Committee.* In the article, the NCAA Committee on Competitive Safeguards and Medical Aspects of Sport issued a statement

on the dangers of repeated head injuries in football, stating:

> [T]hose individuals who have been rendered unconscious, even momentarily, in a given game should never be allowed to play again in the same game and not allowed to return to contact until all symptoms have cleared up entirely and he has been checked by a competent medical authority.

66.    Rather than inform Plaintiff and other TSU athletes of these risks or implement protocols to protect and safeguard him from TBI-related injuries (as the NCAA promised to do through the NCAA Constitution, among other things), the NCAA failed to meaningfully adopt or enforce the internationally accepted guidelines regarding concussion management and return to play protocols until 2010.

67.    Instead, in complete disregard of the vast body of known scientific evidence and the resources and authority that it possessed, the NCAA failed prior to 2010 to, amongst other things, do any of the following:

- implement adequate guidelines or rules to prevent repeated concussions, and educate players, including Plaintiff, about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football;

- recommend or enforce adequate return to play procedures or take action to educate athletes, including Plaintiff, about the risks of repetitive head injuries;

- conduct a football program that proactively encouraged Plaintiff and other TSU football players to avoid head injuries, instead compelling players to ignore concussion symptoms and continue to play football within moments of experiencing concussion symptoms; and

- contact football players, including Plaintiff, after they left TSU to inform them that they had been exposed to an increased risk of long-term brain damage by the sub-concussive and concussive blows sustained while playing football for TSU.

68.    In April 2010, under mounting public pressure, the NCAA made changes to its concussion treatment protocols, this time enacting a new policy that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

69.    Under that new policy, which became effective in August 2010, member schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussion."

70.    The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and the team physician would determine that medical clearance.

71.    Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses to the institutional medical staff, including signs and symptoms of concussions" and noted that students would be provided educational materials on concussions during the signing process.

72.    This policy is flawed though: due to the very nature of concussions, athletes suffering concussive injuries are in no position to police themselves or to give informed consent about whether to continue playing. For example, the types of questions used to screen players for concussions include "What's your name?", "What year is it?", and "What sport are we playing?". These types of questions are used for screening precisely because players experiencing concussions routinely fail to answer them correctly, despite their very elementary nature. Following logically on that, a player who cannot state his or her own name is in no condition to make an informed decision about whether or not to continue playing, and is entirely

dependent on others, such as the NCAA and TSU, to identify concussive injuries in real-time and take appropriate remedial actions. The NCAA has stood in the role of guardian, tasked with making decisions in Plaintiff's and other football players' best interests. The NCAA failed to fulfill that role and instead acted in its own self-interest, to the detriment of its student-athletes, including Plaintiff.

73.     In the end, the NCAA implemented these (still deficient) policies far too late for Plaintiff Ferguson and other TSU football players.

### FACTS SPECIFIC TO JOSEPH FERGUSON

74.     Plaintiff Joseph Ferguson played football at TSU in 2009, as a quarterback.

75.     While playing at TSU, Plaintiff Ferguson suffered from numerous concussions, as well as countless sub-concussive hits as part of routine practice and gameplay.

76.     Since the inception of TSU's football program, through at least 2010, there were no adequate concussion management protocols or policies in place to address and treat concussions sustained by student-athletes during practice and in games. For instance, when Plaintiff Ferguson and other TSU players experienced a significant head injury or concussion, they would quickly be returned to the field of play or only be taken out of play or practice for an inadequate period of time.

77.     In fact, although Plaintiff Ferguson sustained repetitive serious blows to the head in practices and games for the NCAA's profit, the NCAA failed to adopt or implement adequate concussion management safety protocols or return to play guidelines during his time on TSU's football team.

78.     As a result, Plaintiff Ferguson now suffers from issues including, but not limited to, short term memory loss, depression, suicidal thoughts, and emotional instability.

## CLASS ACTION ALLEGATIONS

79.    **Class Definition**: Plaintiff Joseph Ferguson brings this action for himself and on behalf of a Class of similarly situated individuals, defined as follows:

> All individuals who participated in TSU's football program between 1952 and 2010.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

80.    **Numerosity**: The exact number of members of the Class is not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. Upon information and belief, hundreds of individuals fall into the definition of the Class.

81.    **Commonality**: There are many questions of law and fact common to Plaintiff and the Class, and those questions predominate over any questions that may affect individual members. Common questions for the Class include, but are not limited to, the following:

(a)    Whether Defendant had a duty to adequately warn and educate players about the dangers and symptoms of concussions and concussion-related brain injuries;

(b)    Whether Defendant had a duty to enact rules and procedures to protect players from sustaining concussions and concussion-related brain injuries;

(c)    Whether Defendant's conduct as alleged herein constitutes a breach of duty;

(d)    Whether Defendant's conduct as alleged herein constitutes negligence;

(e)    Whether Defendant's conduct as alleged herein constitutes breach of contract;

(f)    Whether Defendant's conduct as alleged herein constitutes fraudulent concealment; and

(g)    Whether Plaintiff and the Class are entitled to equitable relief, including actual and compensatory damages, and other injunctive relief.

82.    **Typicality**: Plaintiff's claims are typical of those of members of the Class, as Plaintiff and other members sustained injuries arising out of the same wrongful conduct of Defendant.

83.    **Adequate Representation**: Plaintiff will fairly and adequately represent the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

84.    **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Class is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (<u>Individually and on Behalf of the Class as Against Defendant</u>)

85.    Plaintiff incorporates by reference the foregoing allegations.

86.    From its inception and by virtue of its role as the governing body of college athletics, the NCAA has historically assumed a duty to protect the health and safety of all athletes at member institutions, including Plaintiff Ferguson. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its athletes.

87.    The duties of the NCAA included specific obligations to supervise, regulate, and monitor the rules of the TSU football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to TSU football players, including Plaintiff Ferguson.

88.    The NCAA had a duty to educate TSU football players on the proper ways to evaluate and treat head injuries during and after football games and practices, including repetitive concussive and sub-concussive injuries. The NCAA's duties further included a duty to warn its athletes of the dangers of concussive and sub-concussive injuries and of the risks associated with football before, during, and after they played college football, and as additional information came to light.

89.    The NCAA had a duty not to conceal material information from TSU football players, including Plaintiff Ferguson.

90.    The NCAA breached its duties owed to TSU student-athletes, including Plaintiff

Ferguson, by failing to implement, promulgate, or require appropriate and up-to-date guidelines regarding the evaluation and treatment of TBIs on the playing field, in the locker room, and in the weeks and months after they sustained TBIs, as well as providing treatment for the latent effects of TBIs. These failings included, but are not limited to:

    (a)    failing to adequately recognize and monitor concussive and sub-concussive injuries during football practices and games;

    (b)    failing to adequately inform student football players of the dangers of concussive and sub-concussive injuries;

    (c)    failing to adequately design and implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;

    (d)    failing to adequately design and implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries;

    (e)    failing to adequately inform the families of student football players who sustained concussive and/or sub-concussive injuries; and

    (f)    failing to adequately provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time student football players, including Plaintiff Ferguson, left TSU.

91.    The NCAA breached its duties to student football players, including Plaintiff Ferguson, by failing to disclose and/or failing to recognize and/or being willfully non-observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including Plaintiff Ferguson.

92.     As a football player at TSU, Plaintiff Ferguson and those like him relied upon the guidance, expertise, and instruction of the NCAA in understanding the risks associated with serious and life-altering concussive and sub-concussive hits in football.

93.     At all times, the NCAA had superior knowledge of material information regarding the effects of repeated head injuries, including through its institutional knowledge of such effects. Because such information was not readily available to TSU football players, including Plaintiff Ferguson, the NCAA knew or should have known that they would act and rely upon its guidance, expertise, and instruction on these crucial medical issues while attending TSU and thereafter.

94.     Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

95.     In addition, repetitive concussive and sub-concussive blows to the head can significantly increase a person's risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions, especially when such blows are sustained at an early age.

96.     As a direct and proximate result of Defendant's negligence, student-athletes, including Plaintiff Ferguson, experienced repetitive concussive and sub-concussive impacts during their college football careers, which significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease,

and other, similar cognitive-impairing conditions. And indeed, Plaintiff now suffers from, and continues to suffer from, issues including but not limited to short term memory loss, depression, suicidal thoughts, and emotional instability.

97.     The repetitive head accelerations and hits to which student-athletes, including Plaintiff Ferguson, were exposed to presented risks of latent and long-term debilitating chronic illnesses. Absent the NCAA's negligence and concealment, the risk of harm to these student-athletes, including Plaintiff Ferguson, would have been materially decreased, and they would not have developed serious mental health issues.

98.     As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have incurred damages in the form of permanent brain damage, emotional distress, past and future medical costs, health care costs, home care expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Plaintiff and other members of the Class will likely incur future damages caused by Defendant's negligence.

99.     As such, Defendant is the direct and proximate cause of Plaintiff and the putative Class's injuries, and is liable to them for the full measure of damages allowed under applicable law, as well as interest, reasonable attorneys' fees, expenses, and costs.

**SECOND CAUSE OF ACTION**
**BREACH OF EXPRESS CONTRACT**
**(<u>Individually and on Behalf of the Class as Against Defendant</u>)**

100.    Plaintiff incorporates by reference the foregoing allegations.

101.    As a football player at TSU, an institution governed by the NCAA, Plaintiff Ferguson and other TSU football players were required to, and did, enter into contracts with the NCAA as a prerequisite to sports participation. These contracts required Plaintiff Ferguson and other TSU football players to complete a form affirming that they had read the NCAA

regulations and applicable NCAA Division manual, which expressly encompassed the NCAA

Constitution, Operating Bylaws, and Administrative Bylaws, and further, that they agreed to

abide by Division Bylaws.

102. In exchange for these student-athletes' agreements, the NCAA promised to

perform certain services and functions, including, amongst other things:

(a) conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational wellbeing of NCAA athletes;

(b) requiring that each member institution protect the health of, and provide a safe environment for, each of its participating athletes; and

(c) requiring that each member institution establish and maintain an environment in which the NCAA athletes' activities are conducted as an integral part of the athletes' educational experience.

103. By signing and agreeing to abide by NCAA rules and regulations, and thereafter

participating in NCAA-sanctioned sports programs in accordance with said rules and regulations,

Plaintiff Ferguson and other TSU football players fulfilled their contractual obligations to the

NCAA.

104. As described in the foregoing allegations, the NCAA breached its contractual

agreement by failing to ensure Plaintiff Ferguson and other TSU student-athletes were provided

a safe environment in which to participate in collegiate football. The NCAA further breached its

contractual agreement by concealing and/or failing to properly educate and warn Plaintiff

Ferguson and other TSU football players about the symptoms and long-term risks of concussions

and concussion-related traumatic injury.

105. Plaintiff Ferguson and other TSU football players entered into written agreements

with the NCAA in which they committed to play football at TSU, to attend TSU as students, and

to comply with all codes of conduct and obligations as both football players and students at TSU.

106.     Plaintiff Ferguson and other TSU football players fulfilled their contractual obligations to the NCAA.

107.     The NCAA's contractual breaches caused Plaintiff Ferguson and other TSU football players to suffer injuries and damages in the form of, *inter alia*, past, ongoing, and future medical expenses, lost time, lost future earnings, and other damages.

108.     As a result of its misconduct, the NCAA is liable to Plaintiff and the Class for the full measure of damages and other relief allowed under applicable law.

### THIRD CAUSE OF ACTION
### FRAUDULENT CONCEALMENT
### (Individually and On Behalf of the Class as Against Defendant)

109.     Plaintiff incorporates by reference the foregoing allegations.

110.     The NCAA has long understood that repetitive head impacts sustained while playing football created a risk of harm to student-athletes that was similar or identical to the risk boxers faced by participating in boxing practices and matches.

111.     The NCAA was aware of and understood the significance of the published medical literature described herein, which detailed the serious risk of short- and long-term brain injury and disease associated with repetitive head impacts, including those which Plaintiff Ferguson and other TSU football players were exposed.

112.     The NCAA knowingly concealed these risks from Plaintiff Ferguson and other TSU football players considering whether or not to participate in an NCAA football program.

113.     By concealing these highly material facts, the NCAA intended to induce a false belief in Plaintiff Ferguson and TSU football players like him about the short- and long-term risks of repetitive head impacts in football. As an entity that voluntarily took on the role of governing the sport of football in colleges across the country (including TSU), and was created

and perpetuated specifically to protect player safety, the NCAA had a duty to speak about these issues—instead, it remained silent. The NCAA's intent in doing so was to induce Plaintiff Ferguson and other TSU football players to continue playing NCAA football, even after sustaining one or more concussions and even when those concussions required additional time to heal.

114.    Plaintiff Ferguson and other TSU football players could not have reasonably been expected to know or discover the truth about the risks associated with concussive and sub-concussive blows to the head, or were misled from obtaining such truthful information. Plaintiff Ferguson and other TSU football players were under the care and treatment of the NCAA, and justifiably relied on the NCAA's silence as representing facts that did not exist.

115.    Given the NCAA's superior and unique vantage point, Plaintiff Ferguson and other TSU football players reasonably looked to the NCAA for guidance on head impacts—and concussions, in particular—as well as the later-in-life consequences of receiving repetitive head impacts during football games and practices at TSU.

116.    The NCAA failed to act reasonably in light of its omission, including by failing to develop and implement adequate guidelines and rules regarding return-to-play criteria, and other safety procedures. The NCAA's inaction and concealment increased the risk of long-term injury and illness in TSU football players, including Plaintiff Ferguson—and indeed, did result in them suffering from long-term brain injuries and disease.

117.    As a direct and proximate result of Defendant's knowing concealment and/or willful blindness, Plaintiff Ferguson and other TSU football players suffered substantial injuries.

118.    As a direct result of the NCAA's failure to reveal pertinent information, Plaintiff Ferguson and TSU football players like him incurred economic and non-economic damages in

the form of pain and suffering, permanent brain damage, past and future medical costs, health care costs, home care expenses, other out of pocket expenses, lost time, lost future earnings, and the loss of enjoyment of life.

119.    As a result, Defendant is liable to Plaintiff and the Class for the full measure of damages allowed under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Joseph Ferguson, individually and on behalf of the Class, respectfully requests that the Court enter an Order providing for the following relief:

A.    Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as representative of the Class, and appoint his counsel as Class Counsel;

B.    Declare that Defendant's actions, as set out above, constitute negligence, breach of contract, and fraudulent concealment;

C.    Award all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and caused by Defendant's conduct, including without limitation damages for past, present, and future medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, and all other damages suffered, including any future damages likely to be incurred by Plaintiff and the Class;

D.    Award Plaintiff and the Class reasonable litigation expenses and attorneys' fees;

E.    Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

F.    Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

G.    Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**JOSEPH FERGUSON**, individually and on behalf of all others similarly situated,

Dated: July 26, 2021          By: /s/ Jeff Raizner

*One of Plaintiff's Attorneys*

Jeff Raizner
efile@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel: 713.554.9099
Fax: 713.554.9098

Jay Edelson*
jedelson@edelson.com
Benjamin H. Richman*
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian*
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff and the Putative Class*

*Admission to be sought.